# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN WOLF PARTNERS, GREY WOLF PARTNERS, and SUN WOLF PARTNERS, | CASE NO. CV F 08-0618 LJO SMS |
| Plaintiffs, | **ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION**  (Doc. 73) |
| vs. | |
| BASF CORPORATION, | |
| Defendant. | |

## INTRODUCTION

Defendant BASF Corporation ("BASF") moves for summary judgment against Plaintiffs[1] on their claims that two fungicides produced by BASF–Cabrio® and Pristine® (collectively "Fungicides")–damaged their blueberry crops. BASF argues that Plaintiffs' tort claims fail as a matter of law, because they are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §136 *et seq*. ("FIFRA"). In the alternative, BASF attacks Plaintiffs' expert testimony and argues that Plaintiffs have no evidence of causation that is "scientifically valid." In opposition, Plaintiffs argue that BASF's motion is a "calculated diversion of the law." Plaintiffs ask this Court to deny the summary judgment motion, and to sanction BASF for bringing this Fed. R. Civ. P. 56 motion in bad faith. Having considered the parties arguments, this Court DENIES BASF's summary judgment motion, and DENIES Plaintiffs request for sanctions.

---

[1] Plaintiffs are Golden Wolf Partners, Grey Wolf Partners and Sun Wolf Partners and will be referred to collectively as "Plaintiffs." Tom Avenilis ("Mr. Avenilis") is a principal in each of the three plaintiff partnerships.

1

# BACKGROUND

## Plaintiffs' Claims

Plaintiffs own commercial blueberry farms in Kern and Tulare Counties. Plaintiffs allege that they have suffered over $22 million in damages, and that their crops continue to show damage, caused by the Fungicides. Plaintiffs contend that the Fungicides damaged their blueberry crops because the active ingredient in the Fungicides is a plant growth regulator ("PGR") that, if applied improperly, damages plants. Plaintiffs' claims are based on, *inter alia*, BASF's alleged failure to warn Plaintiffs that the Fungicides' active ingredient was a PGR in addition to a fungicide, and BASF's failure to provide safe use instructions for the PGR. Proceeding on their third amended complaint, plaintiffs assert the following causes of action against BASF, the Fungicides' manufacturer and distributor: (1) strict liability; (2) negligent manufacturing; (3) negligence in labeling; and (4) intentional misrepresentation.

## Pyraclostraobin

Pyraclostrobin is one of the most widely utilized blueberry fungicides in the United States. Pyraclostrobin is the active ingredient in Cabrio, and one of two active ingredients in Pristine. Pyraclostrobin belongs to the strobilurin class of fungicides and was developed from a fungus that grows on pine cones. It can control fungal disease by inhibiting mitochondrial respiration, which is the process by which carbon compounds are broken down into the energy the fungus needs for growth. Pyraclostrobin is an effective fungicide.

## Plaintiffs' Damage, Investigation, and Testing

From 2004-2007, Plaintiffs applied the Fungicides to their conventionally-farmed blueberry fields, along with a variety of other agricultural chemicals. In 2007, Plaintiffs noticed obvious damage to their fields, including: low yield, shot berries, stunted growth, odd foliar development, tissue discoloration, flowers stuck in the calyx, low seed count, sticky flowers, small berries, twisted stems, and sub-standard taste. In addition, Plaintiffs claim a reduced yield. Plaintiffs fields are miles apart, with two located in Kern County and one located in Tulare County. Although the fields were miles apart, the damage was the same across all fields, and across the entire fields.

Plaintiffs considered the damage to the fields to be "classical plant growth regulator damage." Although the damage was noted to be caused by a PGR, Plaintiffs had not applied a PGR across the

fields. The only PGR used was on a few plants in a small area of one field. To determine the damage, Plaintiffs, through Mr. Avenilis, retained the services of Dr. Julian Whaley and Dr. Mark Steinberg.

Drs. Whaley and Steinberg investigated Plaintiffs' damaged fields. In addition, they investigated three other fields in California and two other fields in Oregon that experienced the same damages, and compared those fields to others that had not applied the Fungicides. Drs. Whaley and Steinberg determined that the common denominator for the damaged fields was the use of the Fungicides.

Mr. Avenilis and Drs. Whaley and Steinberg were confused by the results of their investigation. The damages caused by the Fungicides were not classic pesticide damage, which normally burns a plant. Rather, the symptoms indicated damage from a PGR. Mr. Avenilis contacted BASF and inquiried whether pyraclostrobin was also a PGR. BASF denied that it was.

Mr. Avenilis and Drs. Whaley and Steinberg performed an experiment to confirm the trend that plant damage increased with the increase of pyraclostrobin and the same damage experienced by the Plaintiffs' fields. Dr. Whaley designed the tests, and Mr. Avenilis helped to arrange the logistics for the tests to be conducted. The tests included a random selection. Over 940 plants were treated in the experiment, with half receiving an application of Cabrio, and half receiving an application of Cabrio and other adjuvants that were used by Plaintiffs in the past. The results established that with increased applications of pyraclostrobin, the plants yields decreased. The Cabrio treated plants showed the same symptoms as the Plaintiffs' fields had experienced in 2007. Drs. Whaley and Steinberg concluded that pyraclostrobin is a PGR, despite BASF's denial, and caused the damage to Plaintiffs' blueberry crops.

BASF argues that these tests are not "scientific" and their results should be excluded as evidence. BASF points out that none of Plaintiffs' experts has published a report that identifies pyraclostrobin as causing negative PGR effects. In addition, Plaintiffs' experts are unable to point to a published report that supports their findings and conclusions.

**BASF's Testing of Pyraclostrobin**

BASF maintains that pyraclostrobin is safe to use on blueberries. Pyraclostrobin was tested in multiple environments, including tests done in California and tests done on blueberries in other states. There are approximately 60 published reports of controlled blueberry field trials in which pyraclostrobin was tested for safety and efficacy. No evidence of crop injury was reported.

3

Plaintiffs point out that there have been no tests conducted on California blueberries. The 60 published reports conducted tests on blueberries in the Eastern United States, where the conditions are moister and colder than in California's Central Valley. Experts agree that PGRs can be damaging to plants in one area and safe to use on the same plants in a different area.

The University of California Kearney Research and Extension Center in Parlier, California has applied pyraclostrobin (Pristine) in its controlled blueberry varietals from 2005-2010. BASF contends that none of the negative effects Plaintiffs complain of has been reported by the UC Kearney Research Center. Plaintiffs contend that these test results are inconclusive, because the researchers applied pyraclostrobin only once per year, whereas commercial growers applied the Fungicides several times as allowed by the products' labels. In addition, Plaintiffs contend that there is evidence that the 2010 production of blueberries at the UC Kearney Research Center may have been retarded, and the yields obtained are much smaller per acre than commercial growers.

**FIFRA**

The Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. §136 *et seq.*, generally provides for federal regulation of pesticides, including registration and labeling requirements. The Fungicides qualify as pesticides for FIFRA purposes, and the labeling of the Fungicides are governed by FIFRA. FIFRA authorizes the United States Environmental Protection Agency ("EPA") to register pesticides, including the Fungicides, and to approve their labels. To obtain EPA approval, a manufacturer must submit a proposed label and supporting data. 7 U.S.C. §§136a(c)(1)(C), (F). The EPA will register the pesticide if it determines that the: (1) pesticide is efficacious, 7 U.S.C. §136a(c)(5)(A); (2) pesticide will not cause unreasonable adverse effects on humans and the environment, 7 U.S.C. §§136a(c)(5)(C), (D), 7 U.S.C. §136(bb); and (3) label complies with the statute's prohibition on misbranding. 7 U.S.C. §136a(c)(5)(B); 40 C.F.R. §152.112(f).

A pesticide is "misbranded" under FIFRA if the label contains a statement that is "false or misleading in any particular." 7 U.S.C. §136(q)(1)(A). This includes a statement regarding the efficacy of the pesticide. 40 C.F.R. §156.10(a)(5)(ii). A pesticide is also "misbranded" if its label does not contain adequate instructions for use, or if its label omits necessary warnings or cautionary statements. 7 U.S.C. §§136(q)(1)(F), (G).

FIFRA contains provisions regarding a state's role in pesticide regulation. 7 U.S.C. §136v provides:

> (a) In general
> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
> (b) Uniformity
> Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.
> (c) Additional uses
> (1) A state may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the [EPA]. Such registration shall be deemed registration under section 136a of this title for all purposes of this subchapter, but shall authorize distribution and use only within such State...

BASF contends that 7 U.S.C. 136v(b) preempts Plaintiffs' tort claims.

**EPA Approval of Fungicides**

BASF developed and manufactured the Fungicides to control fungal diseases on blueberries. BASF applied to the EPA for the approval and registration of the Fungicides. As part of the approval process, BASF conducted numerous tests regarding the use of Fungicides. During the approval process, BASF and the EPA exchanged frequent correspondence regarding the content of the labeling for the Fungicides. The EPA registered Cabrio EG ® on September 20, 2002 and Pristine ® on July 23, 2003. On these dates, BASF was authorized to market the Fungicides with the EPA-approved labels. The Fungicides contained the EPA-approved labels.

In 2006 and 2008, BASF sought EPA approval to add claims of plant health benefits to the Fungicides' labels. The parties dispute whether EPA understood the "plant health" verbiage to mean that the plants would have increased health benefits because the plants would be free from fungus, or whether the Fungicides also provided positive PGR effects to plants. The parties further disagree as to whether BASF has reported to the EPA that pyraclostrobin is a PGR and the significance of tests that BASF submitted in the EPA in 2009, after this action was initiated.

BASF also applied to the California Department of Pesticide Regulation ("DPR") for approval of the Fungicides. On February 23, 2003, the DPR approved the Fungicide's labels. The Fungicides' labels conformed to those approved by DPR.

Plaintiffs relied on the labels that were approved by both the EPA and DPR to determine how to use the Fungicides properly. Plaintiffs followed the directions for use as written on the labels.

### PGRs and Pyraclostrobin

FIFRA defines a PGR as:

> any substance or mixture of substances intended through physiological action, for accelerating or retarding the rate of growth or rate of maturation, or for otherwise altering the behavior of plants or the produce thereof, but shall not include substances to the extent they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculates, and soil amendments. Also, the term plant regulator shall not be required to include any of such of those nutrient mixtures or soil amendments as are commonly known as vitamin, hormone, horticultural products, intended for improvement, maintenance, survival, health, and progagation of plants and are not for pest destruction and are nontoxic, nonpoisonous in the undiluted package concentration.

PGRs effect the physiology of the plants. PGRs can cause injury to plants if used improperly. Plaintiffs' and defense experts agree that to avoid plant damage when applying a PGR, farmers must always check the label of the substance to identify hazards associated with the particular product and must follow those directions. Failure to follow those instructions may cause damage to the plants.

Plaintiffs surmised based on their investigation and testing that pyraclostrobin is a PGR. BASF now admits that pyraclostrobin is a PGR, and that it has known that pyraclostrobin is a PGR since January 1, 2005. The EPA-approved labels for the Fungicides do not indicate that they are PGRs and do not provide instructions for their use as a PGR.

### Procedural History

This action was removed from the Tulare County Superior Court on May 2, 2008. The Court related the instant action to *Willems Farms, Inc. v. BASF Corporation, et al.*, Case No. CV F 08-616 LJO SMS ("*Willems Farms*"), an action that also alleged damages to blueberry crops caused by the use of Fungicides. *Willems Farms* subsequently settled. Plaintiffs' complaint was challenged on a number of grounds through motions to dismiss. Plaintiffs now proceed on their third amended complaint.

BASF moved for summary judgment on November 8, 2010. Plaintiffs opposed the motion on November 24, 2010. BASF filed a reply on December 8, 2010. The parties agreed to submit this motion without a hearing. This Court considered the parties arguments and exhibits, the applicable law, and the record, and issues the following order.

///

# DISCUSSION

## Standard of Review

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party seeking summary judgment/adjudication bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving party bears the burden of proof at trial. *Id*. at 322. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor, but "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial." "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et*

*al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

With these standards in mind, the Court turns to the parties' arguments.

### Whether FIFRA Preempts Plaintiffs' Claims

BASF argues that FIFRA preempts Plaintiffs' state tort claims. BASF points out that FIFRA prohibits states from imposing requirements on pesticide labels that are "in addition to or different from" FIFRA requirements. BASF incorporates Plaintiffs' responses to its interrogatories wherein Plaintiffs fault BASF for "failing to adequately warn the user of potential damages to blueberry crop if the products were used on blueberries." BASF contends that based on these responses, Plaintiffs' claims seek to impose an additional warning on the Fungicides' labels. BASF concludes that these responses establish that Plaintiffs' claims are attempting to impose additional or different language on the Fungicides' EPA-approved labels, and are therefore preempted.

Plaintiffs counter that their causes of action are not preempted by FIFRA, because these claims are "parallel to" FIFRA's requirements. Plaintiffs contend that BASF was obligated by FIFRA to warn users of the potential harm that the Fungicides might have on blueberries and to provide instructions for its proper use. Plaintiffs point out pursuant to FIFRA, a pesticide is "misbranded" if "the labeling does not contain directions for use which are necessary for effecting the purpose for which the product was intended and...are adequate to protect health in the environment." 7 U.S.C. §136(q)(1)(g). A pesticide is likewise "misbranded" if "the label does not contain a warning or cautionary statement which may be necessary" or if "its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular." 7 U.S.C. §§136(q)(1)(A), (G). Moreover, FIFRA includes a continuing obligation for manufacturers to update information regarding their pesticides. 7 U.S.C. §136j(a)(1)(E). Plaintiffs contend that their claims are consistent with, and parallel to, the misbranding provisions of FIFRA, and are therefore not preempted.

The parties both rely on *Bates v. Dow*, 544 U.S. 431 (2005) to support their positions. In *Bates*, the Supreme Court considered whether FIFRA preempted state-law claims for damages asserted by a group of Texas peanut farmers against a pesticide manufacturer. 544 U.S. at 434. The farmers had asserted fraud, warranty, deceptive trade practices, and strict liability claims against the manufacturer based on the damage the manufacturer's pesticide allegedly caused to their crops. *Id*. at 436. The

8

intermediate court found the claims to be preempted by FIFRA, because those claims, if successful, would give the manufacturer a "strong incentive" to change its label. *Id*. The intermediate court also found that a strict liability claim, which it viewed as a "disguised" failure-to-warn claim, was preempted because "success on this claim would against necessarily induce [the manufacturer] to alter the [pesticide] label." *Id*. Noting a conflict among the states and circuits on this issue, the Supreme Court granted review, and reversed the intermediate court's opinion.

The Supreme Court rejected the intermediate court's conclusion that a state law claim is preempted if enforcement of that claim induces a party to change its label that has been approved by the EPA. The Court pointed out FIFRA's preemption provision, 7 U.S.C. §136v(b), prohibits "requirements," and explained that the "Court of Appeals was...quite wrong when it assumed that any event, such as a jury verdict, that might 'induce a pesticide manufacturer to change its label should be viewed as a requirement." *Id*. at 443. The Court explained that the "inducement test is unquestionably overbroad because it would impeach many 'genuine' design defect claims[.]" *Id*. at 445.

BASF argues that FIFRA preempts Plaintiffs' claims because, if successful, Plaintiffs' claims would require BASF to change its labels. BASF argues that Plaintiffs' claims are "disguised" as failure-to-warn claims, which impermissibly impose additional labeling requirements. As set forth in *Bates*, however, this "inducement test is not supported by either the text or the structure of the statute." *Id*. at 446. This effects-based test was rejected by the Supreme Court, which held that two conditions must be satisfied before a state law is preempted by FIFRA (as discussed more fully below). Accordingly, BASF's arguments fail on this ground.

BASF's interpretation of the FIFRA preemption provision is overbroad. FIFRA:

> pre-empts competing state labeling standards–imagine 50 different labeling regimes prescribing the color, font size, and wording of warnings–that would create significant inefficiencies for manufacturers. The provision also pre-empts any statutory or common law rule that would impose a labeling requirement that diverges from those set out in FIFRA and its implementing regulations. It does not, however, pre-empt any state rules that are fully consistent with federal requirements.

544 U.S. at 452. The *Bates* Court emphasized that although 7 U.S.C. §136v(b) may preempt "judge-made rules, as well as statutes and regulations," the "*scope* of that preemption" is limited. *Id*. at 444. (emphasis in original). FIFRA's preemption provision applies only if two conditions are satisfied:

> First, it must be a requirement 'for *labeling or packaging*"; rules governing the design of a product, for example, are not pre-empted. Second, it must impose a labeling or packaging requirement that is *'in addition to or different from"* those requirements under this subchapter. A state regulation requiring the word "poison" to appear in red letters, for instance, would not be pre-empted if an EPA regulation imposed the same requirement.

*Id*. (emphasis in original). Considering the limited, narrow scope of FIFRA's preemption provision:

> it is perfectly clear that many of the common-law rules upon which petitioners rely do not satisfy the first condition. Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market their products free from manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging." None of these common-law rules requires that manufacturers label or package their products in a particular way. Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not preempted.

*Id*. at 445.

Plaintiffs' claims are not preempted to the extent that they are not "labeling or packaging" requirements. Plaintiffs' state law claims are the same or similar to those at issue in *Bates*, including strict liability and defective manufacture. As set forth above, a state law must satisfy both conditions to be preempted. BASF's motion, however, is limited to the second condition. BASF wholly ignores the first condition in its argument, and fails to address whether Plaintiffs' causes of action are "labeling or packaging" requirements. Because BASF disregarded whether Plaintiffs' claims meet *both* conditions of preemption, BASF failed to establish that Plaintiffs' claims are preempted as a matter of law. For this reason, BASF's motion is denied.

In addition, Plaintiffs' claims do not impose requirements that are "in addition to or different from" FIFRA's requirements. FIFRA "prohibits only state-law labeling and packaging requirements that are 'in addition to or different from' the labeling and packaging requirements under FIFRA. Thus, a state-law labeling requirement is not pre-empted by §136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions." *Bates,* 544 U.S. at 447. BASF argues that Plaintiffs' failure-to-warn claims would require them to change their EPA-approved labels, which imposes additional requirements on the labels that were approved by the EPA. But because FIFRA prohibits misbranding and places a continuing obligation on manufacturers to update information regarding efficacy, Plaintiffs persuasively argue that their claims are consistent with FIFRA's requirements:

> A state cause of action that seeks to enforce a federal requirement does not impose a requirement that is 'different from or in addition to,' requirements under federal law. To be sure, the threat of a damages remedy will give manufacturers an additional cause to comply, but the requirements imposed on them under state and federal law do not differ.

*Id*. at 448. Indeed, "although FIFRA does not provide a federal remedy to farmers and others who are injured as a result of a manufacturer's violation of FIFRA's labeling requirements, nothing in §136v(b) precludes States from providing such a remedy." *Id*.

For the foregoing reasons, BASF's summary judgment motion based on preemption grounds is denied.

## Whether Plaintiffs' Evidence is "Scientifically Reliable"

Plaintiffs rely on three experts and their testimony to establish causation–Mr. Avenilis, Dr. Whaley and Dr. Steinberg. BASF argues that pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579 (1993), Plaintiffs' experts' purported proof of causation is inadmissible because it is unreliable. The Court considers the reliability of Plaintiffs' experts below.

Under Federal Rule of Evidence 702, testimony offered by an expert witness must "assist the trier of fact to understand the evidence or determine a fact in issue." Expert testimony is admissible when "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id*.; *see also, Daubert*, 509 U.S. at 592-93. Accordingly, expert testimony is admissible if it both reliable and relevant. *See Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (amended by 319 F.3d 1073 (9th Cir. 2003)).

BASF challenged the reliability of Plaintiffs' experts. This Court must act as a "gatekeeper" to exclude "junk science" that does not meet Fed. R. Evid. 702's reliability standards by making a preliminary determination that the expert's testimony is reliable. *Mkhtar*, 299 F.3d at 1063. A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000); *see also Kumho Tire* Co. *v. Carmichael*, 526 U.S. 137, 152 (1999). The "inquiry envisioned by Rule 702 is a flexible one," *Daubert*, 509 U.S. at 594, and must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150.

BASF asserts that Plaintiffs' experts' testimony is unreliable because neither they nor their conclusions meet the non-exhaustive list of factors set out in *Daubert*, 509 U.S. at 593-94. BASF argues: (1) Plaintiffs' causation theory is not generally accepted in the scientific community; (2) Plaintiffs' causation theory has not been subjected to peer review and publication; and (3) Plaintiffs' causation theories have not been confirmed by "properly conducted" testing. Moreover, BASF contends that Plaintiffs' causation theory "does not fit" the facts of this case, because PGRs are known to have a beneficial effect on plants.

Having considered the parties' arguments, the experts qualifications, the examination conducted by the experts, the facts of this action, and the relevant law, this Court finds Plaintiffs' experts to be reliable for the following reasons:

First, Plaintiffs' expert witnesses are highly qualified to testify on the relevant issues in this action. The experts have specialized knowledge, skill, experience, training, and education on the subject matter. *See United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.2000). Mr. Avenilis has a Bachelor of Science Degree in Crop Science with a concentration in plant science from California Polytechnic State University. He has thirty years of experience in farming. He is a licensed pest control advisor and consultant, and has testified as an expert witness multiple times on farming-related issues. In addition, he has specific knowledge of the blueberry fields at issue in this action. Drs. Steinberg and Whaley each has a B.S., M.S., and Ph.D. in Plant Pathology. In addition, each has taught classes at the university level in the relevant areas of study, testified multiple times as an expert witness, and published peer review articles on subjects relevant to the issues raised in this action. Accordingly, Plaintiffs' experts are qualified to testify to these issues.

Second, the scientific methodologies used by the experts are commonly used and accepted scientific methods. The experts first visited Plaintiffs' blueberry fields as well as fields from San Diego to Oregon. The experts drew conclusions based on these visual inspections. Defense expert William Cline testified that he also uses visual trend, and considers it to be a reasonable scientific method. The experts next used a blind experiment in the blueberry fields to determine if applying pyraclostrobin would demonstrate a trend of increased damage with increased applications. Dr. Whaley has been employed by pesticide companies to perform similar trend testing, and he has found the method to be

reliable and effective. BASF failed to establish that the scientific methodologies used by Plaintiffs' experts were unreliable.

Third, the methodology "fits" the conclusions. *See GE v. Joiner*, 522 U.S. 136,151 (1997). Drs. Whaley and Steinberg and Mr. Avenilis conducted their investigation and experiments prior to litigation to determine the cause of the damage to Plaintiffs' blueberry fields and the blueberry fields of three other growers. After establishing that the damage symptoms were the same in each of those fields, the process of elimination and determination began. The testing revealed to Plaintiffs' experts that pyraclostrobin may have caused the damage. Thus, the tests performed by the experts on the blueberry plants fit the conclusion that pyraclostrobin causes PGR damage to the blueberry plants.

BASF's arguments improperly focus on the Plaintiffs' experts conclusions. The relevant inquiry, however, is whether the methodology, technique, or qualifications of the experts are reliable. Moreover, BASF contends that Plaintiffs' experts' conclusions are unreliable because they have not been tested, yet the relevant inquiry is whether the theory *can* be tested. *See Daubert*, 509 U.S. 592. BASF *could* perform the examinations that the Plaintiffs' experts performed.

For these reasons, this Court finds Plaintiffs' expert testimony admissible. Because Plaintiffs' expert testimony supports Plaintiffs' claims as to causation, BASF's summary judgment motion is denied.

**Plaintiffs' Sanctions Request**

Plaintiffs request attorneys' fees as a sanction pursuant to Fed. R. Civ. P. 56(h).[2] Plaintiffs argue that BASF brought this summary judgment motion in bad faith. Plaintiffs contend that this motion is a "calculated diversion from the law in an intentional effort to prevent the plaintiffs from their right to be heard can not [sic] also become an economic travesty." Plaintiffs request to recover the expenses of opposing this motion in an amount exceeding $22,000 as a sanction.

Fed. R. Civ. P. 56(h) reads:

---

[2] Plaintiffs moved for sanctions pursuant to Fed. R. Civ. P. 56(g). Fed. R. Civ. P. 56 was amended and became effective on December 1, 2010, The applicable provision for this "motion" is Fed. R. Civ. P. 56(h). The rule changed substantively, in that the older version of the rule held that a court "*must* order the submitting party to pay the other party reasonable expenses," whereas the new rule holds that a court "*may* order the submitting party to pay the other party the reasonable expenses."

> If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court–after notice and a reasonable time to respond–may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

Here, Plaintiffs have failed to identify "an affidavit or declaration" that was submitted in bad faith. In addition, Plaintiffs fail to establish that BASF filed this motion solely for the purpose of delay or in bad faith. While the parties disagree on the merits of Plaintiffs' claims, and BASF's motion was ultimately unsuccessful, there is no evidence to suggest bad faith. The Court is not satisfied that an affidavit or declaration was submitted in bad faith. Accordingly, this Court denies Plaintiffs' request for sanctions.

## CONCLUSION AND ORDER

For the foregoing reasons, this Court DENIES BASF's summary judgment motion and DENIES Plaintiffs' request for sanctions.

IT IS SO ORDERED.

**Dated:   December 13, 2010**              /s/ Lawrence J. O'Neill
                                              UNITED STATES DISTRICT JUDGE